UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BRENT TEASLEY, et al.,           )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )          Case No. 4:06-CV-773 (JCH)
                                 )
NIC FORLER, et al.,              )
                                 )
          Defendants.            )

## MEMORANDUM AND ORDER

The matter is before the Court on Defendants' Motion for Summary Judgment (Doc. No. 25), filed November 30, 2007. The matter is fully briefed and ready for disposition.

## BACKGROUND

Defendant Lincoln County, Missouri ("County") is a political subdivision of the State of Missouri, and the Lincoln County Sheriff's Department (Sheriff's Department") is the County's law enforcement agency. (Defs.' Statement of Material Facts ("Defs.' Facts"), Doc. No. 27 at ¶ 1). Defendant Daniel Torres ("Torres") was, at all relevant times, the Lincoln County Sheriff and Defendant Nic Forler ("Forler") was one of his deputies. (Id. at ¶¶ 3-4).

## I.    The October 23, 2005 Shooting

At 11:30 p.m. on October 23, 2005, Forler began pursuing a red pickup truck driven by Tyler Teasley ("Teasley") that was speeding on Missouri Route 47. (Id. at ¶¶ 5-7; Mot. for Sum. J., Doc. No. 25 at Ex. Z). The truck also contained five passengers: Michael Brown ("Brown"); Sarah Hayes ("Hayes"); Judah Potthoff ("Potthoff"); Adam Walton ("Walton"); and Julia Yerke ("Yerke"). (Defs.' Facts at ¶ 7). Teasley and his passengers were having a "rolling party" and were all drinking alcohol.

1

(Mot. for Sum. J. at Ex. C pp. 12-25). Teasley initially failed to yield, but he then entered a subdivision, pulled into a private driveway, and turned off his engine and lights. (Id. at Ex. B pp. 40-49). Teasley placed the car in neutral so he could coast into the driveway. (Id. at p. 48).

At 11:31 p.m., Forler radioed the Sheriff's Department dispatcher and stated that the truck had "blacked out." (Defs.' Facts at ¶ 11). Forler pulled his patrol car behind the truck, exited it, and walked between the two vehicles. (Id. at ¶ 12). While walking between the vehicles, Forler yelled, "Let me see your hands." (Mot. for Sum. J. at Ex. AA p. 250). The truck began rolling backwards,[1] causing Forler to fire two shots into the truck. (Defs.' Facts at ¶¶ 12, 14). Forler moved out of the way and the truck struck his patrol car.[2] (Id. at ¶ 12). Forler testified that, as the car began to roll backwards, he "yelled for it to stop and I shot. And then I yelled stop again and shot." (Mot. for Sum. J. at Ex. AA p. 252). Forler fired both shots within a few seconds. (Id.). The bullets struck Brown and Teasley. (Defs.' Facts at ¶ 14).

At 11:31 p.m., Forler radioed that shots had been fired. (Id. at ¶ 15). Only twenty-eight seconds elapsed since his first radio communication. (Resp. at Ex. 4 p. 13). He then heard female voices inside of the truck and ordered everyone to "get out of the truck and lay on the ground with their hands raised." (Mot. for Sum. J. at Ex. AA p. 308). Hayes, Potthoff, Walton, and Yerke complied with this order. (Id.). At 11:34 p.m., Forler requested an ambulance and medical helicopter. (Id. at Ex. Z). Forler checked both Brown and Teasley's vital signs, but did not administer first aid

---

[1] Forler testified that the truck's movement was "a lunge, like a quick accelerated start." (Mot. for Sum. J. at Ex. AA p. 250).

[2] The Missouri Highway Patrol and the Federal Bureau of Investigation jointly recreated the accident. They determined that the patrol car and the truck were eighteen feet apart and that the only force propelling the truck was gravity. (Resp. at Ex. 1). As such, they found that the truck was traveling 3.2 miles per hour, and eight seconds elapsed between the truck beginning to roll and the truck striking the patrol car. (Id.)

to either. (Defs.' Facts at ¶ 18). Forler then moved to a location where he could watch Walton, Potthoff, Hayes, and Yerke, but he did not search them for weapons or place them in restraints.[3] (Mot. for Sum. J. at Ex. AA pp. 315-16).

About four minutes after the shooting, Deputy Tracy McCoy ("McCoy") arrived and began administering first aid. (Id. at pp. 318-19; Resp. at Ex. 4 p. 14). McCoy found that Brown was dead and tilted Teasley's head back to aid his breathing. (Resp. at Ex. 28 pp. 18-19). Medical personnel arrived shortly thereafter and transported Teasley to St. John's Mercy Medical Center ("St. John's") in Creve Couer, Missouri. (Defs.' Facts at ¶ 20). The Sheriff's Department ordered Deputy Shane Duryea ("Duryea") to go to St. John's and "maintain security" over Teasley. (Id. at ¶ 23). Duryea was told that prisoner protocol applied, meaning that the individual is "not allowed any contact with anybody" and no information about the individual is disclosed. (Mot. for Sum. J. at Ex. CC pp. 25-26). Prior to his arrival at St. John's, Duryea had not been told what had happened, but inferred that Forler had shot someone and was not injured. (Id. at pp. 23-24).

The Sheriff's Department did not contact Teasley's family ("Plaintiffs") to inform them of the shooting. (Resp. at Ex. 29 pp. 29). St. John's chaplain contacted Plaintiffs and asked them why they were not at the hospital. (Id. at pp. 29-30). He also told them to call the Sheriff's Department for more details. (Id. at p. 30). They called the Sheriff's Department, but could not get an answer. (Id. at p. 30). After calling 911, they spoke with Rick Harrell, who told them that Teasley had been shot, but provided no other details. (Id.). He then told them to wait five minutes while he talked to an

---

[3]Sheriff's Department policy states that "[i]f and when the scene is secure, the Deputy will render first aid to any victims, until such time another first responder or medical personnel relieves him." (Resp. at Ex. 22).

officer at the scene. (Id. at p. 31). Plaintiffs waited for ten minutes, but did not receive a call back. (Id.).

While standing outside of Teasley's ICU bay, the chaplain informed Duryea that Plaintiffs had arrived. (Defs.' Facts at ¶ 26). Duryea told Plaintiffs that they could not see Teasley because they did not have clearance. (Resp. at Ex. 29 p. 33). After this initial conversation, Plaintiffs spoke with the chaplain before again attempting to see Teasley. (Id. at p. 34). Again, Duryea prevented them from seeing Teasley. (Id. at p. 34). Ten minutes after this conversation, the chaplain returned and told Plaintiffs that they now had clearance. (Id. at p. 35).[4] Mary Teasley, Teasley's mother, attempted to hold his hands, but found that bags that had been placed on them to preserve evidence and Duryea would not remove them. (Id. at p. 36). Approximately an hour later, an officer from the Missouri Highway Patrol ("Highway Patrol") arrived and told Duryea to leave. (Id.). At 6:28 a.m. on October 24, 2005, Teasley died from his injuries. (Defs.' Facts at ¶ 35).

Following the incident, Deputy Michael Lang ("Lang") took Forler to the Lincoln County Medical Center for drug and alcohol testing. (Resp. at Ex. 24 p. 24). Sheriff's Department policy requires that after an officer involved shooting, the officer must be tested for drugs and alcohol. (Id. at pp. 24-25). Lang asked the medical center staff to administer a drug and alcohol test. (Id. at p. 30). A technician came to do the testing, but Forler's consent form shows that he only signed the "Substance Abuse (Drug) Testing" line and not the "Alcohol Testing" line. (Id. at Ex. 23). Lang cannot recall what exactly happened because he was "preoccupied" with phone calls from other officers. (Id. at Ex. 24 p. 32).

---

[4]It is unclear whether this permission came from the the Sheriff's Department or the Highway Patrol. (Resp. at Ex. 31 pp. 36-38).

In the months following the incident, Sheriff's Department deputies were allegedly stationed near Plaintiffs' home in marked police cars. (Id. at Ex. 30 ¶ 3). These cars would follow Plaintiffs as they conducted daily activities such as going to church, the grocery store, and the bank. (Id. at ¶ 4). Shortly after Teasley's funeral, Brent and Mary Teasley pulled onto the side of the highway in order to give Brent Teasley's parents their mail. (Id.). Two Sheriff's Department deputies approached the car with their hands on their guns and asked why they were parked on the side of the highway. (Id.). Additionally, the Sheriff's Department deputy assigned to Tyler Teasley's school began making comments to him that Teasley had a "criminal past and that what happened was inevitable." (Id. at ¶ 6). Teasley, however, had no criminal past other than "traffic tickets." (Id. at ¶ 7). These encounters caused the twelve year old Tyler Teasley to panic when he saw the officer and to vomit. (Id.). Tyler Teasley changed schools midyear in order to avoid the deputy. (Id.).

## II.     The Sheriff's Department Hiring Process and Forler's Hiring

The Sheriff's Department hired Forler in 2003 after he graduated from the Eastern Missouri Law Enforcement Training Academy ("Academy"). (Defs.' Facts at ¶ 37). At this time, the Sheriff's Department had no written hiring process policy. (Mot. for Sum. J. at Ex. D p. 222). Generally, an applicant would come in, fill out an application, and speak with a captain. (Id. at p. 224). The applicant would then supply the pertinent documentation, such as their POST Certificate,[5] and have a short interview. (Id. at pp. 224-25). At that time, the applicant also had to take a writing test to confirm that he could write police reports. (Id. at p. 225). The command staff would then have an "oral board" interview with the applicant. (Id. at p. 226). The Sheriff's Department would also conduct a background check, which included requesting all of an applicant's Academy records. (Id.

_____

[5]A Police Officer Standard Training ("POST") Certificate certifies that the individual in question has met the State of Missouri's qualifications to become a police officer. See Mo. Rev .Stat. § 590.030-.070.

at pp. 235-36). At this point, Torres would receive a recommendation about the applicant and would also interview him. (<u>Id.</u> at p. 227).

Two other relevant hiring procedures also merit discussion. First, the Sheriff's Department did not conduct psychological testing. (<u>Id.</u> at p. 252). Secondly, Captain Cesar Rivera ("Rivera"), the officer in charge of hiring, testified that six months after an officer had worked for the Sheriff's Department, some of the documents in his personnel file would be shredded. (Resp. at Ex. 21 pp. 20-27).[6] Specifically, he would shred documents related to the "hiring process; the testing; the interviewing paperwork."(<u>Id.</u> at p. 21). Torres was aware of this policy and approved of it. (<u>Id.</u> at p. 22).

During Forler's application process, the Sheriff's Department learned that he had a grade point average of 94.96 at the Academy and graduated eighth out of his class of twenty four. (Mot. for Sum. J. at Ex. L). His background search showed that he had been charged with felony assault in November 1997, but that the case had been dismissed. (Mot. for Sum. J. at Ex. S). It also indicated that he was arrested and convicted of driving while intoxicated and being a minor in possession of alcohol in September 1999. (<u>Id.</u> at Ex. D p. 242). Although these incidents raised "a red flag" with Torres, he considered them to be youthful mistakes. (<u>Id.</u> at p. 242). Torres knew that Forler had failed out of community college after one semester, but determined that it was not an issue because "he wasn't cut out to be a college student" and had "graduated the Police Academy with great grades." (<u>Id.</u> at pp. 239-40).

---

[6] Rivera explained that the shredding was done due to "[s]pace capacity" and due to "the overwhelming number of applications" being filed. (Resp. at Ex. 21 p. 22, 27). Rivera testified that there were fifty to one hundred applicants a year. (<u>Id.</u> at p. 23).

Dr. Angela Wingo, PhD., Plaintiff's expert witness, stated that the Sheriff Department's investigation was deficient in multiple ways. First, she noted that the Sheriff's Department failed to obtain the results of a psychological test he received at the Academy. (Resp. at Ex. 20 p. 22). The test rated Forler as a "not recommended" and the comments stated, "admits overlooking safety procedures felt unnecessary 5 or more times." (Id. at Ex. 26). Dr. Wingo did not know if this report was given to the Sheriff's Department, but noted that there was "no rational reason why they would eliminate that particular item." (Id. at Ex. 20 p. 22). She also noted that the Sheriff's Department failed adequately to examine his community college transcript, which showed that Forler failed four out of five classes before dropping out. (Id. at p. 21). Dr. Wingo believed that these grades indicate that he was not a good candidate because he either "was not capable of handling the stress or the academic rigors." (Id.). Dr. Wingo also believed that Torres' investigation into Forler's work history, as well as his assault charge, was inadequate. An evaluation from his previous employer stated that he had "issues with the public" and "was counseled on that." (Id.). Finally, she believed that a more thorough investigation of the assault would have shown that Forler was the aggressor. (Id. at pp. 27-28).

## III.    Forler's Training

As previously stated, Forler graduated from the Academy in 2003 with good grades. (Mot. for Sum. J. at Ex. L). Additionally, Forler had a Class A Certificate from the Police Officer Standard Training ("POST") Commission.[7] (Defs.' Facts at ¶ 38). When he first began working at the Sheriff's Department, Forler was assigned to a field training officer and rode along with this officer for thirty days. (Mot. for Sum. J. at Ex. D p. 67). The Sheriff's Department also trained its officers by

---

[7]Missouri requires all police officers to be POST certified. (Mot. for Sum. J. at Ex. D pp. 44-45).

discussing different topics during roll call meetings. (Defs.' Facts at ¶ 40). Forler received training in the use of force twice, in vehicle pursuit, deadly force, high risk vehicle stops, and de-escalation techniques. (Mot. for Sum. J. at Ex. P p. 2). His deadly force training consisted of watching a thirty minute video about the legal restrictions on deadly force and taking a pre-exam. (Pls.' Facts at ¶¶ 75-76). The Sheriff's Department also gave Forler a Standard Operating Procedure Manual ("Manual") that contained its use of force policy. (Defs.' Facts at ¶¶ 41-42). The parties agree that the use of force policy contained in the Manual was an appropriate policy. (Id. at ¶ 46). David Grossi, Plaintiff's expert, contended that Forler's training was deficient because, although his deadly force training covered marksmanship and how to shoot his weapon, it did not adequately cover "judgmental shooting" or "how to properly use deadly force. (Pls.' Facts at ¶ 45 (sic)).

## IV  Defendants' Investigation of Citizen Complaints

Torres testified that the Sheriff's Department had a standard procedure for investigating citizen complaints. First, a complaint would be sent to the supervisor of the particular platoon. (Mot. for Sum. J. at Ex. D p. 22). The supervising officer would then inform the captain, who would refer the case to the prosecutor's office for investigation. (Id.). Dr. Wingo, however, contended that the Sheriff's Department "arbitrarily [chose] which complaints to receive and even investigate." (Resp. at Ex. 19 p. 9). Sam Steward, an investigator with the Highway Patrol, testified that he did not like to work with the Sheriff's Department because he believed that they were improperly trained and had heard allegations of abuse by the Sheriff's Department deputies. (Id. at Ex. 32 pp. 63-66).

In its interrogatory answers, Defendants stated that there were twenty-three complaints of excessive force and the Sheriff's Department never found that any excessive force occurred. (Mot. for Sum. J. at Ex. DD). Torres also explained that none of the incidents involved Forler (Id. at Ex.

D p. 283) and that the only other time that an officer had discharged his firearm occurred in 2003 when a suspect reached for an officer's gun.(Id. at Ex. FF p. 111).

Despite Defendants' representations, Plaintiffs later found three individuals who claimed that Forler assaulted them and Torres knew about it. Sandy Thompson, Brad Eakins ("Brad"), and Brian Eakins ("Brian"), claimed they were driving down the road when they came around a bend and almost hit a parked police car jutting into the road. (Resp. at Ex. 16 p. 15). The Eakins then spoke to two police officers, Forler and Deputy J. Hoyt ("Hoyt"), and told them "you guys are in a bad spot. We almost hit you." (Id.). The officers had the Eakins pull over and began yelling at them. (Id. at pp. 15-16). Hoyt asked Brad to get out of his car, while Forler asked Brian, who was laying in the back seat eating a cookie, if he were "eating drugs." (Id. at p. 17). Brian testified that Forler then removed him from the car. (Id. at Ex. 17 p. 17). As he was removed from the car, Brian stumbled and had trouble standing. (Id. at p. 18). Forler accused of him of resisting arrest and Brian told him, "I'm not resisting, you can't throw me around, look at my head. I've got staples. I was in a real bad car crash." (Id. at p. 18).[8] Brian continued to have trouble standing and Forler threw him to the ground. (Id. at p. 18). Brad claimed that Forler seemed to be kicking Brian while he was on the ground. (Id. at Ex. 16 pp. 17-18).

Forler drove Brian to the Sheriff's Department and argued with him during the ride. (Id. at Ex. 17 pp. 19-20). Towards the end of the ride, Brian testified that Forler "grabs me by the head and stun guns the shit out of me until I pass out." (Id. at p. 20). At the police station, Brian was placed in a restraining chair. (Id.). Brian claimed another stun gun was used on him as he was brought into his cell. (Id. at pp. 22-23). As this tasering was occurring, Brad had a taser used on him. (Id. at Ex. 16 p. 25). Brad complained about the use of force to a female officer. (Id. at p. 26). Sandy Thompson

---

[8]Brian stated that he was on pain killers due to his injuries. (Resp. at Ex. 17 p. 17).

testified that the following morning, she called the Sheriff's Department and complained about the treatment of the Eakins. (Id. at Ex. 15 p. 14). She admits never filing a written complaint. (Id. at p. 15-16).

On January 10, 2008, Defendants found the use of force reports regarding the Eakins incident. (Mot. to Compel, Doc. no. 42 at p. 4). Hoyt stated that this incident occurred on May 5, 2005 and began when Brian yelled from a passing vehicle that he was going to "[k]ick our ass." (Resp. at Ex. 7 p. 3). The officers asked Brian to exit the vehicle, and after exiting, he stood in an "aggressive stance with his fists clenched." (Id.) The officers arrested Brian, who then resisted by struggling, refusing to place his hands behinds back, and kicking at Hoyt. (Id.). Hoyt then tasered Brian in the stomach, and Forler restrained Brad. (Id.). Hoyt confirmed that Brian was placed in a "special chair for officer safety." (Id. at p. 4).

At the Sheriff's Department, Daniel Manhunt ("Manhunt") wrote in his report that, upon seeing Brian in the restraint chair, Brad became "agitated" and verbally hostile. (Id. at p. 10). Brad yelled that, "I'm fucking military, either you take my brother out of that fucking chair or I will." (Id.) Despite being asked to cooperate, Brad began to stand. (Id.). In response, Manhunt tasered him for three seconds. (Id.). He then cooperated and Manhunt gave him first aid. (Id.).

Plaintiffs filed their initial Complaint on May 11, 2006. (Doc. No. 1). On April 9, 2007, Plaintiffs filed their Amended Complaint alleging the following counts: Count I– violation of 42 U.S.C. § 1983 for excessive use of force; Count II--violation of § 1983 for deprivation of necessary medical care; Count III– Wrongful Death, Mo. Rev. Stat. § 537.080; Count IV--violation of 42 U.S.C. § 1985; Count V– violation of § 1983 for failure to train, screen, and supervise; and Count

VI– negligent infliction of emotional distress.[9] (Doc. No. 15). Defendants filed their Motion for Summary Judgment on November 30, 2007. (Doc. No. 25). Defendants admit that their motion does not address the excessive force claim against Forler. (Reply, Doc. No. 33 at p. 2). In their Response, Plaintiffs conceded that they voluntarilly dismissed Count IV, the § 1985 conspiracy claim, with prejudice. (Resp. at p. 29).

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. Anderson, 477 U.S. at 256.

---

[9]Forler, Torres, and Lincoln County are named as Defendants in each count. (Am. Compl., Doc. No. 15 at pp. 4, 9, 12, 16, 20, 24). Duryea is named as defendant in Count IV and Count VI. (Id. at p. 16, 24).

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. <u>Anderson</u>, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. <u>Id.</u> at 249.

## **DISCUSSION**

### I.      **Motion for Contempt**

On February 11, 2008, Plaintiffs filed a motion for contempt alleging that Defendants had failed to disclose the use of force forms related to the Eakins incident as well as disclosing that any such incident occurred. (Doc. No. 42). After reviewing the interrogatories, the Court finds that imposing sanctions under Fed. R. Civ. P. 37 is not warranted. The interrogatories ask for "all Complaints" regarding Forler as well as a description of "each and every Complaint" regarding any Sheriff's Department Employee. (<u>Id.</u> at Ex. 1). Defendants provided all the relevant information about the "written Complaints" in their possession (<u>Id.</u>). They were not asked to produce each use of force form. (<u>Id.</u>). If Plaintiffs determined that Defendants' answers were inappropriate, misleading, or incomplete, they should have filed a motion to compel. As such, the Court will not impose sanctions.

### II.     **Section 1983 Claim of Excessive Use of Force**

In Count I, Plaintiffs allege that Forler used excessive force by shooting Teasley. In Counts I and V, Plaintiffs also allege that Torres and the County are liable for Forler's actions because of their policies and customs. Plaintiffs further allege that Torres is liable on these counts in his individual capacity. Specifically, Plaintiffs allege that Torres and the County failed (1) to train their officers properly; (2) to discipline, supervise, and control their officers; and (3) to screen and hire its prospective officers adequately.

As an initial matter, a city or supervisor cannot be held liable where there is no underlying constitutional violation. See Abbott v. City of Crocker, 30 F.3d 994, 998 (8th Cir. 1994). Because Forler has not moved for summary judgment on the excessive force claims against him, the Court assumes, for the purposes of this motion, that an underlying constitutional violation exists.

There is no vicarious liability under § 1983. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). In order for a municipality liable under § 1983, a plaintiff must identify a governmental "policy or custom that caused the plaintiff's injury." Brockinton v. City of Sherwood, 503 F.3d 667, 674 (8th Cir. 2007). A governmental policy "involves a deliberate choice to follow a course of action . . . made from among various alternatives by an official who has the final authority to establish governmental policy." Jane Doe A. ex rel. Jane Doe B. v. Special Sch. Dist. of St. Louis County, 901 F.2d 642, 645 (8th Cir. 1990). A governmental custom involves a "a pattern of persistent and widespread . . . practices which bec[o]me so permanent and well settled as to have the effect and force of law." Id. at 646. A supervisor may only be held individually liable under § 1983 if he either "directly participates in a constitutional violation or if [he] failed to supervise and train" his officers. Johnson v. Blaukat, 453 F.3d 1108, 1113 (8th Cir. 2006); see Jane Doe A., 901 F.2d at 645 (setting out standard for individual liability, which mirrors standard for municipal liability). It is undisputed that Torres did not directly participate in the shooting.

### 1. Training

Plaintiffs allege that the failure to train Forler in judgmental shooting amounted to deliberate indifference. Defendants respond the Sheriff's Department adequately trains its officers.

In a § 1983 failure to train claim, Plaintiffs must show that (1) the Sheriff's Department training was inadequate, (2) this failure to train "reflects a deliberate and conscious choice" by Torres and the County, and (3) the alleged deficiency in the training procedures actually caused Teasley's

death. Ambrose v. Young, 474 F.3d 1070, 1079 (8th Cir. 2007); see Jane Doe A., 901 F.2d at 645 (setting out standard for individual liability, which mirrors standard for municipal liability). For liability to attach, Plaintiffs must show that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that [Torres] can reasonably be said to have been deliberately indifferent to the need. " Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir. 1996). The Eighth Circuit explains that a failure to train claim "generally requires the municipality to have prior notice of the officers' misbehavior and to act with deliberate indifference." Audio Odyssey Ltd. v. Brenton First Nat. Bank, 245 F.3d 721, 742 (8th Cir. 2001) rev'd on other grounds, 286 F.3d 498 (8th Cir. 2002) (en banc).

As previously stated, Plaintiffs allege that the failure to training Forler in judgmental shooting amounted to deliberate indifference. The Court disagrees because Plaintiffs have framed the issue too narrowly. Rather, the issue is whether Forler was trained in the use of force and in traffic stops. The Court finds that the need for "more or different training" was not obvious. The record shows that Forler received over 800 hours of training at the policy academy as well as over a month of training while riding with another officer.(Mot. for Sum. J. at Ex. D, L); see Smith v. Watkins, 159 F.3d 1137, 1139 (8th Cir. 1998) (explaining that sufficient training constituted on the job training and graduation from police academy); accord Andrews, 98 F.3d at 1076-77. Forler received training in the use of force twice, vehicle pursuit, deadly force, high risk vehicle stops, and de-escalation techniques regarding the use of force. (Mot. for Sum. J. at Ex. P p. 2). Moreover, neither side disputes that the Sheriff's Department had an adequate policy use of force policy, and that it was given to Forler. (Mot. for Sum. J. at Ex. T p. 30). The Sheriff's Department was not required to lead Forler through this policy step-by-step. See Liebe v. Norton, 157 F.3d 574, 579 (8th Cir. 1998).

Plaintiffs' claim also fails because he cannot show that Defendants were on notice that the officer's misbehavior meant that he required more training.[10] Audio Odyssey Ltd., 245 F.3d at 742. Viewing the evidence in the light most favorable to Plaintiffs, Forler assaulted the Eakins in May 2005 and Torres knew about it. (Resp. at Ex. 15, 16). Forler, however, received more training in the use of force after this incident. Specifically, on October 1, 2005, only three weeks before the incident, Forler received training in de-escalation and the use of force. (Mot. for Sum. J. at Ex. P).[11] Thus, Plaintiffs' cannot show the Defendants were deliberately indifferent by failing to offer more training to Forler in the use of force.

### 2. Discipline, Supervision, Control

Because Plaintiffs have not alleged that Defendants had an official policy of failing to supervise its officers, the Court looks at whether the evidence would permit a reasonable jury to find a relevant municipal custom existed. See Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999). Plaintiffs must show a (1) continuing, widespread, and persistent pattern of unconstitutional behavior; (2) a deliberate indifference or tacit authorization of the conduct by the policymakers after being put on notice; and (3) that the custom was the moving force behind Teasley's injury. Ware v. Jackson County, 150 F.3d 873, 880 (8th Cir. 1998); see Jane Doe A., 901 F.2d at 645 (setting out standard for individual liability, which mirrors standard for municipal liability). Additionally, a single incident does not usually suffice to prove a custom claim. Mettler, 165 F.3d at 1205.

---

[10]Although Plaintiff correctly points out that prior misbehavior is not always required, the Court does not believe that this case is one of the rare cases excepted from the general rule. See Bd. of County Comm'rs v. Brown, 520 U.S. 397, 409 (1997).

[11]Whether Forler received this training in response to his prior misbehavior is irrelevant. It is undisputed that he received more training in the use of force after the Eakins incident.

Upon consideration, the Court finds that a reasonable jury could find that a custom of failing to supervise the deputies of the Sheriff's Department existed. Plaintiffs have put forward evidence that the Sheriff's Department did not investigate complaints of excessive force. Specifically, Defendants failed to investigate the Eakins' claim and haphazardly destroyed documents in personnel files. (Resp. at Ex. 15, 16, 21). Dr. Wingo testified that the Sheriff's Department "arbitrarily chooses which complaints to receive and even investigate." (Id. at Ex. 19 p. 9). This evidence creates a genuine issue of material fact about whether a municipal custom existed and whether Torres was deliberately indifferent to the misbehavior of his officers. Although tenuous, the Court also finds that this evidence could allow a reasonable jury to conclude that such a custom was the moving force behind the shooting. As such, the Court will not grant summary judgment on this theory.

### 3.  Hiring

The Supreme Court has applied stringent culpability and causation requirements for § 1983 claims against a municipality[12] for faulty hiring decisions. Morris v. Crawford County, 299 F.3d 919, 922 (8th Cir. 2002). The Supreme Court has stated that only where "adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute deliberate indifference." Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 411 (1997). Additionally, plaintiff must show more than the "mere probability that any officer inadequately screened will inflict any constitutional injury." Id. at 412. Instead, plaintiff must show

---

[12]It is unclear whether an individual capacity claim against Torres based on a hiring decision is cognizable under § 1983. See Morris, 299 F.3d at 921 (declining to decide this issue). The Eighth Circuit did state that, if such a claim exists, it would be identical to an official capacity claim. Id.

that "*this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff. The connection between the background of the particular applicant and the specific constitutional violation alleged must be strong." Id. (emphasis in original). The Court held that a municipality could not be liable for its officer's use of excessive force where the officer's criminal record contained convictions for driving while intoxicated, resisting arrest, public drunkenness, and assault and battery. Id. at 416.

The Eighth Circuit notes that Courts have closely adhered to the requirements of Bryan County. See Morris, 299 F.3d at 923. It held that a county is not liable for the excessive force of its officer where his employment records from a prior law enforcement job indicated that he had slapped an inmate, disobeyed orders, cursed at other employees, and been accused of beating his wife. Id. at 925. Specifically, the Court found that the nature of these complaints did not satisfy the "strong" causal connection needed to find that it was obvious risk that he would use excessive force. Id. at 925-26.

Other circuits also closely adhere to the requirements of Bryan County. The Fifth Circuit held a county was not liable under § 1983 for its decision to hire a deputy who shot and killed a citizen even though the deputy's record showed that at his prior police job, he had pistol whipped a teenage boy, had threatened a juvenile's mother, and had not been formally disciplined. Aguillard v. McGowen, 207 F.3d 226, 230-31 (5th Cir. 2000); see Gros v. City of Grand Prairie, 209 F.3d 431, 435 (5th Cir. 2000) (holding city not liable under § 1983 for officer's sexual assault of two women during traffic stops where his file contained statements regarding aggressiveness and complaints about his overbearing nature at traffic stops); Estate of Smith v. Silvas, 414 F. Supp. 2d 1015, 1019 (D. Colo. 2006) (holding that fact that officer had been involved in eight previous shootings, five of which involved a death, did not make it plainly obvious that he would use excessive deadly force). The

Tenth Circuit held that a municipality or supervisor is not liable for hiring a prison guard that sexually assaulted several inmates where his record stated that he was arrested for possession of alcohol at age seventeen and had several speeding tickets. Barney v. Pulsipher, 143 F.3d 1299, 1309 (10th Cir. 1998). Similarly, the Fourth Circuit held that the school board could not be held liable for hiring a high school coach videotaping teenage girls nude in the locker room because prior to that incident, he had only been investigated for videotaping fully clothed girls. Riddick v. Sch. Bd. of the City of Portsmouth, 238 F.3d 518, 525 (4th Cir. 2000); see also Crete v. City of Lowell, 418 F.3d 54, 66 (1st Cir. 2005) (holding not plainly obvious from prior assault and battery conviction that officer would employ excessive force).

Upon consideration, the Court finds that Plaintiffs' evidence does not satisfy the strong causal connection required by Bryan County and its progeny. Here, an adequate investigation into Forler's past would have uncovered his convictions for driving while intoxicated and minor in possession of alcohol as well as his assault arrest. Many courts have held that prior incidents involving assault and alcohol do not make it plainly obvious that an officer would improperly use deadly force. Morris, 299 F.3d at 925-26; Crete, 418 F.3d at 66; Aguillard, 207 F.3d at 230-31; Barney, 143 F.3d at 1309. An adequate investigation would have also uncovered that he failed the Academy psychological exam because he showed a willingness to disregard safety procedures. Complaints about ignoring safety protocols do not make it obvious that an officer will use excessive force. Morris, 299 F.3d at 925-26. Similarly, prior issues concerning communicating with the public, as well as earning poor grades in college, do not satisfy the strong causal connection required by Bryan County. As such, Lincoln County and Torres cannot be liable based on the decision to hire Forler.

III.     **Section 1983 Claim of Deprivation of Medical Care**

In Count II, Plaintiffs allege that Forler, Torres, and the County, denied Teasley medical care, in violation of § 1983. Defendants assert that Forler had no duty to provide medical care other than calling for an ambulance. Plaintiffs counter that a genuine issue of fact remains about whether Forler's actions violated § 1983.

The Due Process Clause of the Fourteenth Amendment requires that the police must provide medical care to "persons . . . who have been injured while being apprehended by the police." City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983). This duty is fulfilled, however, by promptly "summoning the necessary medical help or by taking the injured detainee to the hospital." Maddox v. City of Los Angeles, 792 F.2d 1408, 1415 (9th Cir. 1986). Absent unusual circumstances, a police officer cannot be held liable under § 1983 for failing to provide first aid or CPR so long as he has summoned the necessary medical help. See Tagstrom v. Enockson, 857 F.2d 502, 504 (8th Cir. 1988) (holding officer who called ambulance, but failed to administer CPR to injured motorcyclist did not violate Due Process Clause when ambulance arrived in approximately six minutes); Tatum v. City & County of San Francisco, 441 F.3d 1090, 1099 (9th Cir. 2006) (holding that police officers who called an ambulance for a handcuffed suspect due to his difficulty breathing did not violate Due Process Clause by failing to administer CPR); Wilson v. Meeks, 52 F.3d 1547, 1556 (10th Cir. 1995) (refusing to find that police officers never have a duty to render first aid, but finding that police officer who promptly summoned medical help and left a detainee laying on the ground face down with labored breathing and a gun shot wound did not give rise to a duty to render first aid); Rich v. City of Mayfield Heights, 955 F.2d 1092, 1097 (6th Cir. 1992) (holding that aside from summoning medical help, police have no duty to cut down an inmate discovered hanging in his jail cell).

Upon consideration, the Court finds that Forler had no affirmative duty to provide CPR or other medical care because he summoned an ambulance. Additionally, McCoy arrived shortly

thereafter and gave Teasley some rudimentary first aid. Because Forler did not commit a constitutional violation, neither Torres or Lincoln County can be held liable. <u>See</u> <u>Granda v. City of St. Louis</u>, 472 F.3d 565, 568 (8th Cir. 2007). As such, the Court will grant Defendants' summary judgment on Count II.[13]

## IV. <u>Missouri State Law Claims</u>

Defendants assert that Count III and Count VI must be dismissed as to Torres, Duryea, and Forler because they are protected by the official immunity doctrine. They assert that Lincoln County must be dismissed because it has not waived its sovereign immunity. Plaintiffs respond that Forler's, Duryea's, and Torres' actions excepted them from the official immunity doctrine and that Defendants' purchase of liability insurance resulted in a waiver of sovereign immunity. Defendants contend that Plaintiffs' failure to plead the existence of liability insurance prevents them from relying on this argument.

### 1. <u>Official Immunity</u>

#### A. <u>Individual Liability</u>

The official immunity doctrine insulates public officials "from suit in their individual capacities when liability arises from discretionary acts or omissions" taken by them. <u>Betts-Lucas v. Hartmann</u>, 87 S.W.3d 310, 327 (Mo. Ct. App. 2002). This doctrine, however, does not prevent liability for failure to perform a ministerial duty. <u>Brown v. Tate</u>, 888 S.W.2d 413, 415 (Mo. Ct. App. 1994). A discretionary act requires "the exercise of reason in the adaption of means to an end and discretion in determining how or whether an act should be done or a course pursued." <u>Deuser v. King</u>, 24

---

[13]Even assuming the Court found that Forler had a duty to render first aid, it would still dismiss this claim on the basis of qualified immunity because the right to first aid is not clearly established. <u>See</u> <u>Tagstrom</u>, 857 F.2d at 504; <u>Price v. County of San Diego</u>, 990 F. Supp. 1230, 1243 (S.D. Cal. 1998).

S.W.3d 251, 254 (Mo. Ct. App. 2000) (quoting <u>Rustici v. Weidemeyer</u>, 673 S.W.2d 762, 769 (Mo. 1984)). In contrast, a ministerial act is "of a clerical nature and is performed in a prescribed manner according to legal mandate without regard to the public official's personal judgment or opinion." <u>Id.</u> In determining whether an act is discretionary or ministerial, the Court must conduct a "case-by case determination, weighing such factors as the nature of the official duties, the extent to which the acts involve policymaking or the exercise of professional expertise and judgment." <u>James ex rel. James v. Friend</u>, 458 F.3d 726, 731 (8th Cir. 2006).

Official immunity does not apply, however, if the discretionary acts were done in bad faith or with malice. <u>Blue</u>, 170 S.W.3d at 479 (citing <u>State ex rel. Twiehaus v. Adolf</u>, 706 S.W.2d 443, 446 (Mo. 1986). Bad faith or malice generally requires "actual intent to cause injury." <u>Davis v. Bd. of Educ. of City of St. Louis</u>, 963 S.W.2d 679, 689 (Mo. Ct. App. 1998). The Missouri Supreme Court explains that a defendant acts with malice when he:

> wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another. An act is wanton when it is done with a wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others.

<u>Adolf</u>, 706 S.W.2d at 447 (internal quotations omitted). Similarly, bad faith "embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive, or ill will partaking of the nature of fraud." <u>Id.</u>

Upon consideration, the Court finds that Forler, Torres, and Duryea were engaged in discretionary acts. The act of conducting a vehicle stop and firing a weapon is undoubtedly a discretionary act because it requires the exercise of professional police judgment. <u>See</u> <u>Murray v. Leyshock</u>, 915 F.2d 1196, 1200 (8th Cir. 1990) (holding shooting dog is a discretionary act); <u>Blue v. Harrah's N. Kansas City, LLC</u>, 170 S.W.3d 466, 479 (Mo. Ct. App. 2005) (deciding whether to

arrest someone is a discretionary act). Similarly, maintaining security over someone is a discretionary police function because it requires the officer to use his professional judgment to determine whether any threats exist to his prisoner's, and the public's, well being. See Leyshock, 915 F.2d at 1200 (noting that ministerial acts are almost always "of a clerical nature."). Torres' individual acts were discretionary acts as the hiring and supervision of officers requires the use of professional judgment.

The Court, however, finds that Forler and Torres are excepted from the official immunity doctrine because a reasonable jury could find that malice or bad faith existed. Specifically, Plaintiffs put forward evidence that Torres negligently hired Forler and inadequately maintained records.(Resp. at Ex. 19, 21). There is also some evidence that Torres inadequately investigated citizen complaints. (Id. at Ex. 15, 16, 19). Such evidence, if believed by the jury, shows that his actions were recklessly indifferent to right of others and likely to cause actual injury. Similarly, a reasonable jury could infer from the evidence that Forler acted with malice or bad faith because firing two shots into the back of a truck was contrary to his duty and intended to harm the occupants.

The Court finds that Duryea did not act with either bad faith or malice. Plaintiffs have not put forward any evidence showing that Duryea acted in a way that knowingly contrary to his duty or that he intended to injury them. Rather, the evidence shows that Duryea did not know all the facts underlying the situation. At most, Duryea's behavior amounted to bad judgment, which is not enough to except him from the official immunity doctrine. As such, summary judgment will be granted in part on Count VI as it relates to Duryea.

### B.   Respondeat Superior Liability

In Plaintiffs' Amended Complaint, Counts III and VI allege that Torres is liable for his individual actions as well as on the basis of respondeat superior. (Am. Compl., Doc. No. 15 at pp.

12-13, 24). Torres asserts that Plaintiffs have not put forward evidence that he is responsible under the a respondeat superior theory.

In Missouri, public officers are not responsible for the acts of their subordinates if "(1): if such subordinates are themselves employees of the government; (2) there is no negligence on the part of such public officials in employing them; and (3) the superior officer has not directed or encouraged or ratified such acts or has personally co-operated therein." State ex rel. Hill v. Baldridge, 186 S.W.3d 258, 259 (Mo. 2006) (citing State ex rel. Green v. Neill, 127 S.W.3d 677, 679 (Mo. 2004)). Upon consideration, the Court finds that a reasonable jury could find Torres liable under a theory of respondeat superior because Plaintiffs have put forward evidence that he negligently hired Forler and tacitly ratified his deputies' use of excessive force.

### 2.  Sovereign Immunity

As previously stated, Defendants maintain that Plaintiffs' state law claims against the County fail because it has sovereign immunity and Plaintiffs cannot satisfy the insurance exception. Conversely, Plaintiffs allege that the County does have insurance and that pleading this fact is not required.

Missouri law provides that government entities, such as the County, have sovereign immunity from suit. Mo. Rev. Stat. § 537.600 (creating this immunity). Section 537.600 contains two exceptions to this grant of sovereign immunity, but neither is at issue here. See Hammer v. City of Osage Beach, 318 F.3d 832, 841 (8th Cir. 2003). A public entity may also waive its sovereign immunity by purchasing liability insurance for tort claims other than those specifically exempted by § 537.600. See id. at 841 (discussing Mo. Rev. Stat. § 537.610); Martin v. Mo. Highway & Transp. Dep't, 981 S.W.2d 577, 579 (Mo. Ct. App. 1998); Fields v. Curators of the Univ. of Mo., 848

S.W.2d 589, 592 (Mo. Ct. App. 1993) (citing State ex rel. Bd. of Trs. v. Russell, 843 S.W.2d 353 (Mo. 1992)).

To fall under the insurance exception, a plaintiff must demonstrate the existence of insurance that covers his claim. See Epps v. City of Pine Lawn, 353 F.3d 588, 594 (8th Cir. 2003). A plaintiff must specifically plead facts that demonstrate the claim is within the insurance exception to sovereign immunity. See id. at 594; Brennan ex rel. Brennan v. Curators of the Univ. of Mo, 942 S.W.2d 432, 437 (Mo. Ct. App. 1997) (plaintiff must affirmatively plead the existence of an insurance policy and that the policy covers the claims asserted). Plaintiff, however, contends that Brennan should not be followed because another case held that sovereign immunity must be pled as an affirmative defense. Greene County v. Missouri, 926 S.W.2d 701, 704 (Mo. Ct. App. 1996). Subsequent Missouri cases, as well as the Eighth Circuit, have applied the Brennan rule. See Epps, 353 F.3d at 594; State ex rel. Pub. Hous. Agency of City of Bethany v. Krohn, 98 S.W.3d 911, 914-15 (Mo. Ct. App. 2003). Additionally, this Court has previously determined that it will follow Brennan. See Harris v. Parkway Sch. Dist., No. 4:07-cv-579 (JCH), slip op. at 3-4 (E.D. Mo. June 22, 2007).

Upon consideration, Plaintiffs have failed to plead that an insurance policy existed. According, the Court will dismiss the state law claims against Lincoln County. The dismissal will be without prejudice because the interests of justice require that Plaintiffs have the opportunity to litigate whether this insurance policy waives sovereign immunity. See Fed. R. Civ. P. 15(a)(2). The parties both acknowledge the existence of the policy. This policy was previously litigated in the cause of action brought by the other five occupants of the truck. See Brown v. Forler, 4:06-cv-34 (JEA), 2007 WL 1018759, at * 7 (E.D. Mo. Mar. 30, 2007). As such, the Court will allow Plaintiffs to file an amended complaint pleading the existence of the insurance policy. Plaintiffs, however, are cautioned that the pleadings may not be amended in any other manner.

The Court declines to rule on whether the insurance policy waived sovereign immunity at this time. Although raised in the briefs, the parties spend little time interpreting it and offer no case law to support their arguments. Instead, the Court will order the parties to file simultaneous briefs on the issue. The Court also suggests that the parties file a full copy of the insurance policy so that the Court may adequately interpret it.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 25) is **GRANTED** in part and **DENIED** in part and that Plaintiffs' claims against Defendant Shane Duryea are **DISMISSED** with prejudice.

**IT IS FURTHER ORDERED** that Counts II and IV are **DISMISSED** with prejudice.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Contempt (Doc. No. 42) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Missouri law claims against Defendant Lincoln County are **DISMISSED** without prejudice. Plaintiff may amend its Amended Complaint solely to plead the existence of an insurance policy no latter than **Wednesday, March 19, 2008**. Failure to amend the complaint will result in these claims being dismissed with prejudice.

**IT IS FURTHER ORDERED** that Plaintiffs and Defendants shall file briefs on the issue of whether the insurance policy excepts Plaintiffs' state law claims no later than **Wednesday, March 26, 2008**.

Dated this <u>10th</u> day of March, 2008.

_/s/ Jean C. Hamilton_
UNITED STATES DISTRICT JUDGE